UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| MARY P. WATTERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Cause No. 4:07-cv-66-AS-PRC |
| | ) |
| JIM AARTMAN, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment (Doc. No. 23) filed by Defendant Jim Aartman, Inc. ("Aartman") on Plaintiff Mary Watters ("Ms. Watters") complaint, filed on October 25, 2007. The complaint alleges gender discrimination and retaliation for reporting unlawful activity under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq*. The parties have fully briefed the issues and the Court heard oral argument on the motion in South Bend, Indiana on March 4, 2009. For the reasons discussed below, the Defendant's Motion for Summary Judgment is granted.

### I. STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Nucor Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The moving party bears the burden of identifying those portions of "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits" that the moving party believes demonstrate an absence of genuine issue of material fact. *Celotex Corp.*, 477 at 323. Once this burden is met, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). "[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment is proper.

## II. FACTUAL BACKGROUND

Mary Watters drove semi-trucks for Aartman from the beginning of September 2004 until her termination on October 5, 2006. She primarily hauled milk for the Dairy Farmers of America ("DFA") out of Fair Oaks, Indiana where there is only one terminal. Both Aartman employees and DFA employees worked in and around the terminal building. During the time Ms. Watters was employed by Aartman, she drove over 200,000 miles, or approximately 70 hours every week – the Department of Transportation Limit. Ms. Watters received raises after approximately one year of satisfactory work, and again after her second year employed with Aartman.

When Ms. Watters began working for Aartman, she received and read a copy of Aartman's employee handbook, signed an Acknowledgment of Receipt, and retained the handbook. The handbook contained a policy prohibiting unlawful workplace harassment, which provided that harassment could be reported to an employee's own supervisor, another supervisor, the personnel

administrator, or the president of the company. Ms. Watters also understood that she could call Aartman's main corporate office in California if she had work-related problems.

When Ms. Watters' began working for Aartman, Ron Thompson ("Thompson") managed the Fair Oaks terminal. The terminal manager is, and has always been, the only resident at the Fair Oaks terminal who has the power to hire and fire employees. One day early on, Ms. Watters overheard Thompson complaining to an unknown male employee about how an unidentified female employee at Aartman had become extremely angry because Thompson called the woman "sweetheart." Thompson turned to Ms. Watters, and said, "[y]ou don't mind if I call you sweetheart, do you Mary?" Ms. Watters did not reply, and Thompson did not say anything else at the time.

Ms. Watters subsequently had very little interaction with Thompson; but when she did speak with him, he called her sweetheart. This made Ms. Watters uncomfortable, particularly because Thompson's wife, Vicky Thompson, also worked in the terminal. Ms. Watters claims that she protested against these comments.

In or around December of 2005, Thompson voluntarily stepped down from the terminal manager position and took a lead mechanic position. Charles Henry became the terminal manager. On one occasion after Thompson stepped down, he asked Ms. Watters when were they going to "run away together." Ms. Watters replied that she did not think his wife would like that very much, but Thompson said she would not care. Ms. Watters walked away.

Charles Henry ("Henry") was the terminal manager until July 20, 2006. On at least two occasions during his employment, he said things in front of male co-workers that made Ms. Watters uncomfortable. First, one day Ms. Watters dropped some change on the floor and Henry said, "oh, Mary, you're just trying to show us your ass." In response, Ms. Watters swatted Henry with

whatever she had in her hand. On another occasion, Ms. Watters retrieved paperwork out of a filing cabinet but realized it been moved to a lower drawer. Ms. Watters asked Henry why the paperwork had been moved and Henry replied, "oh, we just put it down there so you'd bend over." Ms. Watters states that she asked Henry to stop making the remarks. Henry's employment ended sometime in late September of 2006, and Thompson also left Aartman.

Ms. Watters had uncomfortable encounters with other men at work. First, towards the end of her first year of employment, Ms. Watters interacted at least twice with a DFA loader named Eric. According to Ms. Watters, Eric grabbed her hand and tried to get her to touch his "member." Eric advised her that he had a picture of his "member," but Ms. Watters refused to look at the picture. After this, Ms. Watters avoided Eric.

Later, Eric's brother, whom Ms. Watters identified as Leon, another DFA employee, humped her leg – "like a dog would hump your leg." Ms. Watters thought this happened at least five times during the second year of her employment. In addition, on at least two occasions, Leon got "[her] to shake his hand and [stuck] his finger in [her] palm." Leon thought these activities were funny, but Ms. Watters did not. Ms. Watters avoided Leon, and never reported Eric or Leon to Aartman because she "didn't want to make a big deal out of it."

In addition, on one occasion late in her employment, a co-worker and friend, Jim Hoffman ("Hoffman"), hid in Ms. Watters' truck and jumped out, startling Ms. Watters greatly. Hoffman did not try to grab Ms. Watters. Hoffman thought this was funny, but Ms. Watters did not. Other workers heard about the incident and made comments, but Ms. Watters did not report the conduct to Aartman.

Finally, Mike Black, a driver, once told Ms. Watters that he liked to "just watch the other

4

guys flock around" her when she went into the terminal. Ms. Watters "made light of" this comment. Ms. Watters also heard from a fellow driver, Larry Flowers, that another unknown driver told people that Ms. Watters sat in the unknown drivers' lap. Ms. Watters actually sat in a chair next to him. Both of these things happened near the end of Ms. Watters' employment.

In addition to her issues with male employees, Ms. Watters had a less than optimal relationship with Vicky Thompson ("Vicky"), the only other woman who worked continuously at the Fair Oaks terminal while Ms. Watters worked for Aartman. Vicky was a secretary and completed paper work including maintaining the drivers' mileage records. Ms. Watters contends that Vicky served as her supervisor after Henry left his position. According to Ms. Watters, she tried to befriend Vicky but she felt that Vicky did not like her because of Ms. Watters' "interaction with the drivers" or "the attention [Ms. Watters] was getting . . .from the men." According to Ms. Watters, Vicky never made comments of a sexual nature to her or about her interactions with Vicky's husband, and Vicky never suggested that Ms. Watters' behavior was inappropriate in any way, nor confirmed Ms. Watters' belief that Vicky disliked her because of Ms. Watters' interaction with men in the terminal. Instead, Ms. Watters just felt that Vicky disliked her based on Vicky's "body language." Based on this, Ms. Watters felt that Vicky treated her in a "sexually retaliatory manner, displaying jealousy/resentment in her supervision of Ms. Watters, in distinction from her supervision of the male co-workers at the Fair Oaks Terminal." Ms. Watters felt that Vicky even appeared "happy" and seemed to be "enjoying" herself when she eventually told Ms. Watters that she was fired.

Prior to Ms. Watters' termination on October 5, 2006, she had a couple of accidents. Specifically, on or about September 9, 2006, Ms. Watters parked her truck in the parking lot of a McDonald's restaurant and went inside. About ten minutes later she returned to her truck and drove

on, until a tollbooth worker told Ms. Watters that her truck's front fender was damaged. Ms. Watters reported the damage as a hit and run accident. The cost to repair the damage was $1,581.00.

Later that month, on September 30, Ms. Watters tried to stop at a gas station in Cobb County, Georgia, but she realized that the gas station was small and then turned at an intersection. Ms. Watters had to turn wide to avoid some debris in the road, misjudged the location of a traffic pole, and ran into it. The accident resulted in $3,174.42 in damage to the truck. The original bill for repair to the traffic pole was $14,003.19. Ms. Watters rode back to Indiana with another driver. Early in the first week of October, Vicky Thompson directed Ms. Watters to remain at home until the accident situation could be reviewed.

When Ms. Watters' damaged truck was returned to the Fair Oaks terminal during the first week of October 2006, Roger Marlow ("Marlow"), Aartman's Vice President of Eastern Operations based in Florida, was at the terminal. Marlow observed the extensive damage to Ms. Watters' truck, learned that the truck had been damaged in two accidents in one month, and discovered that the second accident involved a collision with a stationary object. Based on this information, Marlow concluded that Ms. Watters was an unsafe driver whose employment should be terminated. The Fair Oaks terminal had no manager when Ms. Watters lost her job. Neither Vicky nor Ron Thompson, nor any other person working at the Fair Oaks terminal, influenced Marlow's termination decision.

Because there was no terminal manager at the Fair Oaks terminal, Marlow returned to Florida and instructed Safety Director Lisa Answeeny, who is also based in Florida, to prepare paperwork for, and participate in Ms. Watters' termination, via telephone. The termination call with Answeeny did not occur. Instead, Vicky Thompson told Ms. Watters to come in and clean out her truck because "they [had] fired [her]." While Ms. Watters was at the terminal cleaning out her truck,

6

Vicky told Ms. Watters that she was fired because she had too many points accumulated from her accidents. Vicky also provided paperwork stating this reason, which Ms. Watters signed. According to Ms. Watters, Vicky also stated that the company had followed its policies and that she should read the policies. Ms. Watters understood that someone, maybe Lisa Answeeny, was going to call the terminal to speak with her, but no one called. Ms. Watters repeatedly called Aartman seeking an explanation for her discharge, but no one ever offered her additional information.

In reality, when Marlow decided to terminate Ms. Watters, Aartman had a Professional Drivers Policy in effect, under which drivers received points for accidents, speeding tickets, and other similar events. Marlow, who never liked the policy, did not review or consider the policy before deciding to terminate Ms. Watters. If Marlow had properly applied the policy – because Ms. Watters had just barely passed her second anniversary with Aartman – she would have been suspended for ten days rather than terminated after the Georgia accident because she had accumulated at most four points.

Ms. Watters argues that male Aartman truck drivers who had accumulated points received more favorable treatment than she received, because they were not terminated and the "Professional Driver's Policy" was not enforced against them. Specifically, Ms. Watters identifies these male Aartman drivers as Mike Rector, Tim Rector, and Louie Dumas.

After her termination on October 5, 2006, Ms. Watters filed her charge of discrimination on or about November 13, 2006. In response, Anthony Meli ("Meli"), who was then Aartman's Director of Human Resources based in California, submitted a position statement to the EEOC. Meli failed to speak with Roger Marlow or Lisa Answeeny before preparing the position statement. Meli filed a position statement that contained a number of mistakes. Meli no longer works for Aartman.

7

Ms. Watters asserts that prior to her termination, she "timely communicated her objections relative to sexually offensive comments to Aartman supervisors, including her final supervisor, Vicky Thompson . . .". Ms. Watters does not offer any other specifics about these objections. Ms. Watters also claims that her discharge was "retaliatory in nature, given the aforesaid bias of her final supervisor, Vicky Thompson, the only Aartman supervisor who stated the termination reasons to Watters on October 5, 2006." Ms. Watters suggests that the mistake made by Roger Marlow in terminating Ms. Watters as opposed to suspending her, and the misleading statements made by Anthony Meli, shows that Aartman is attempting to "cover-up" for its discriminatory termination of Ms. Watters. Furthermore, Ms. Watters believes that she was terminated because she challenged conduct protected under Title VII when she communicated her objections to the sexually offensive comments.

## III. DISCUSSION

The Court turns to Ms. Watters' allegations against Aartman[1] in that Aartman discriminated against her based on sex, and retaliated against her for reporting what she believed to be unlawful treatment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq*.

**A)** **Discrimination**

Title VII of the Civil Rights Act of 1964 provides that it "shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because

---

[1] To the extent Ms. Watters raised a sexually hostile work environment claim in her Charge of Discrimination or federal Complaint, she has abandoned the claim during summary judgment. Aside, no evidence in the record supports an actionable claim for hostile work environment. *See Patton v. Keystone RV Co.*, 455 F.3d 812 (7th Cir. 2006).

of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). To prevail on her sex discrimination claim, Ms. Watters must either proffer direct or circumstantial evidence of her employer's discriminatory motivation/intent (known as the direct method), or rely on the indirect burden-shifting method outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 454 (7th Cir. 1999).

In the briefs and during oral argument, counsel for Ms. Watters relies solely on the indirect method to establish her claims. No evidence of record supports her claim under the direct method, or suggests that Aartman took materially adverse action against her—here, termination—on account of an impermissible purpose, such as her being female. *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004); *but see*, *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640, 644 (7th Cir. 2002) *clarified by Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008) (finding that circumstantial evidence is relevant and probative on any of the elements of a direct case) (citing *Treadwell v. Office of Ill. Secretary of State*, 455 F.3d 778, 781 (7th Cir. 2006) and *Sylvester v. SOS Children's Villages of Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006)).

Under the indirect approach, Ms. Watters must present evidence tending to show: (1) she was a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees outside of her protected class. *Dunn v. Nordstrom, Inc.,* 260 F.3d 778, 784 (7th Cir. 2001). *See also Metzger v. Illinois State Police,* 519 F.3d 677, 681 (7th Cir. 2008); *Hague v. Thompson Distribution Co.*, 436 F.3d 816 (7th Cir. 2006). If the plaintiff can establish these four elements, the defendant has an opportunity to articulate a legitimate, nondiscriminatory reason for its action. *Id.* If the defendant does so, the burden shifts back to the

plaintiff and she must offer evidence showing that the defendant's excuse is pretextual. *Id*.

Other than being a member of a protected female class and suffering termination, Ms. Watters has certainly failed to establish the second and forth prongs of the *prima facie* case. Ms. Watters was terminated immediately after Marlow discovered the nature of her two accidents in the single month of September. Even assuming, based on her receipt of regular raises and a point total that called for suspension and not termination, that Ms. Watters was performing satisfactorily, she has not identified any similarly situated male employee given preferential treatment. Ms. Watters identifies Mike Rector, Tim Rector, and Louie Dumas as male Aartman truck drivers who had accumulated points, and received more favorable treatment than she received. Yet, Ms. Watters fails to even suggest the number of points these men accrued, how the points were earned, the resulting punishment, if any, given, and the supervisor or decision-maker involved at the time. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (a similarly situated employee must be "directly comparable in all material respects," such as, whether the employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them).

In fact, counsel for Ms. Watters admitted during oral argument that Ms. Watters is unable to further identify similarly situated employees at this stage. Unfortunately for Ms. Watters, all discovery deadlines passed on September 24, 2008, after an extension of time was granted (Doc. No. 22); and notably, after Plaintiff was compelled to provide initial disclosures, responses to discovery, and to schedule Ms. Watters' deposition (Doc. No. 18). Ms. Watters' discrimination claim cannot survive summary judgment where she fails to establish the existence of an essential element on

which she bears the burden of proof— here, Ms. Watters' cannot establish the *prima facie* case of discrimination, and summary judgment is proper.

**B)** **<u>Retaliation</u>**

Ms. Watters claims that Aartman retaliated against her for reporting what she believed to be unlawful sexual harassment. Under Title VII, it is "unlawful for any employer to discriminate against an employee for opposing a practice made unlawful by the Act." 42 U.S.C. § 2000e-3(a). In order to establish a *prima facie* case of retaliation under the direct method of proof, a plaintiff must establish that she: (1) engaged in a statutorily protected activity; (2) suffered an adverse employment action subsequent to her participation; and (3) there was a causal link between the adverse action and the protected activity. *Burks v. Wis. Dept. of Transp.*, 464 F.3d 744, 758 (7th Cir. 2006). In order to prove a causal link, "the plaintiff is required to show that the employer would not have taken the adverse action 'but for' the plaintiff's engagement in the protected activity." *McKenzie v. Ill. Dept. of Transp.*, 92 F.3d 473, 483 (7th Cir. 1996).

As the Seventh Circuit has stated, "[A]n employer may not retaliate against an employee who has complained about discrimination or other employment practices that violate Title VII . . . ." *Racicot v. Wal-Mart Stores, Inc.,* 414 F.3d 675, 678 (7th Cir. 2005). In this case, Ms. Watters does not seemingly attempt to establish a claim for retaliation under the direct method. Had she, the claim would fail because the record does not indicate that Ms. Watters ever opposed practices made illegal by Title VII, until she filed her EEOC complaint on or about November 13, 2006. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 664 (7th Cir. 2006) (holding that an employer's actions against an employee could not be retaliatory where the employee had not first lodged a complaint that constituted a protected activity). Ms. Watters was terminated for over a month before she filed her

EEOC charge. Assuming Ms. Watters satisfied the first prong of her retaliation claim when she told the male co-workers to stop the inappropriate conduct (specified in the aforementioned facts), she cannot establish a causal link between her termination (whether executed by Marlow, Vicky, or Meli) and the protected activity under the third prong of the retaliation claim.

Under the indirect approach, a *prima facie* case of retaliation is shown if Ms. Watters establishes that she: (1) engaged in statutorily protected activity; (2) met her employer's legitimate expectations; (3) suffered an adverse action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Metzger v. Illinois State Police,* 519 F.3d 677, 681 (7th Cir. 2008). Although Ms. Watters suffered termination, she cannot establish the other elements of the *prima facie* case. Again, assuming she engaged in statutorily protected activity and was meeting Aartman's legitimate expectations, she admittedly cannot show that a similarly situated employee who did not engage in statutorily protected activity received better treatment.

Because Ms. Watters has failed to show retaliation under the direct or indirect method, summary judgment on this claim is appropriate.

## IV. CONCLUSION

Viewing the record in the light most favorable to the non-movant, Ms. Watters cannot show a violation of her rights under Title VII for gender discrimination or retaliation.

Based on the foregoing, the Court **GRANTS** the Motion for Summary Judgment (Doc. No. 23) in favor of Defendant Jim Aartman, Inc. and against Plaintiff Mary Watters. This case is considered closed, with each party to bear its own costs.

**SO ORDERED.**

**DATED: March 13, 2009**

                                              /s/ ALLEN SHARP
                                         **ALLEN SHARP, JUDGE**
                                         **UNITED STATES DISTRICT COURT**